**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

REYNALDO MEDRANO
AYALA,
    *Petitioner-Appellant*,

v.

KEVIN CHAPPELL,
Warden,
    *Respondent-Appellee.*

No. 13-99005

D.C. No.
3:01-cv-00741-BTM-MDD

OPINION

Appeal from the United States District Court
for the Southern District of California
Barry Ted Moskowitz, Chief District Judge, Presiding

Argued and Submitted December 10, 2015
San Francisco, California

Filed July 20, 2016

Before: Alex Kozinski, Jay S. Bybee,
and Morgan Christen, Circuit Judges.

Opinion by Judge Christen

## SUMMARY[*]

### Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of California state prisoner Reynaldo Medrano Ayala's 28 U.S.C. § 2254 habeas corpus petition challenging his conviction and death sentence for triple homicide.

Ayala argued that his defense team was constitutionally ineffective because his lawyers failed to present evidence that would have called into question the credibility of two key prosecution witnesses. The panel agreed with the district court that the California Supreme Court reasonably deferred to defense counsel's choices regarding exclusion of gang affiliation evidence. The panel held that defense counsel's initial decision not to present an inmate's testimony to impeach prosecution witness Juan Manuel Meza did not fall below an objective standard of reasonableness. The panel also agreed with the district court's analysis of counsel's decision not to reopen the defense case after witness Rafael Mendoza Lopez ("Rafa") recanted his exonerating testimony. The panel explained that in light of the risks and difficulties presented by pivoting away from a "no-gang" strategy, the decision not to make such a dramatic transition did not fall below an objectively reasonable standard of care. The panel held that the California Supreme Court likewise did not unreasonably deny Ayala's ineffective-assistance claims as they relate to calling "other witnesses," whom Ayala admitted counsel believed were gang-affiliated. The panel held that

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the California Supreme Court reasonably rejected Ayala's claim that counsel failed to independently investigate the gang affiliation of numerous witnesses before deciding not to call them. The panel explained that even if it reviewed this claim de novo, Ayala would not be eligible for relief. Agreeing with the district court that evidence Ayala first presented in the federal proceedings does not strengthen his ineffective-assistance claims, the panel declined to stay his federal case so that he can seek reconsideration of those claims in the California Supreme Court. The panel held that it was not unreasonable for the California Supreme Court to resolve his ineffective-assistance claims without first granting him an evidentiary hearing.

The panel denied on the merits an uncertified and unexhausted claim under *Brady v. Maryland* that the state failed to disclose impeachment evidence about Meza, and denied as moot Ayala's request for a certificate of appealability as to that claim. Because Ayala did not establish that the state suppressed the information that underpins his certified *Brady* claims relating to Meza, the panel held that the state court's summary denial of them was not unreasonable. The panel held that the California Supreme Court's application of *Brady*, in summarily denying Ayala's claim that the state concealed evidence that Detective Carlos Chacon had a longstanding bias against Ayala and his brother, was reasonable.

The panel held that the California Supreme Court's rejection of Ayala's witness intimidation claim – that Rafa recanted his exonerating testimony as a result of threats and intimidation by Detective Chacon – was not contrary to or an unreasonable application of *Webb v. Texas*. The panel held that the California Supreme Court did not misapply federal

law when it rejected Ayala's claim that the state violated *Napue v. Illinois* by failing to correct Rafa's testimony that Detective Chacon did not threaten him.

The panel held that the California Supreme Court's rejection of Ayala's claim that the trial court committed constitutional error when it refused to strike a juror for cause was not contrary to or an unreasonable application of *Morgan v. Illinois*. The panel could not say that the California Supreme Court's denial of Ayala's claim that the trial court violated his constitutional right to present a defense when it excluded under California hearsay rules the exculpatory statements of a deceased witness was an unreasonable application of *Chambers v. Mississippi*. The panel held that the California Supreme Court's rejection of Ayala's claim of prosecutorial misconduct during closing argument was not an unreasonable application of *Darden v. Wainwright*, and that the rejection of Ayala's related ineffective-assistance claim was likewise not unreasonable. The panel held that Ayala's inability to show prejudice is fatal to his due-process challenge to the penalty-phase admission of evidence that nearly ten years before trial Ayala murdered a fellow inmate.

The panel held that Ayala has not suffered the prejudice that would rise to the level of a constitutional violation based on cumulative error.

The panel held that Ayala does not meet the high threshold of proof that would be required to support a freestanding claim, if cognizable on federal habeas review, of actual innocence.

**COUNSEL**

D. Jay Ritt (argued), Ritt, Tai, Thvedt & Hodges, Pasadena, California; Michael R. Belter (argued), Law Offices of Michael R. Belter, Pasadena, California; for Petitioner-Appellant.

Michael T. Murphy (argued) and Robin Urbanski, Deputy Attorneys General; Holly D. Wilkins, Supervising Deputy Attorney General; Julie L. Garland, Senior Assistant Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Kamala D. Harris, Attorney General; Office of the Attorney General, San Diego, California; for Respondent-Appellee.

**OPINION**

CHRISTEN, Circuit Judge:

Reynaldo Medrano Ayala appeals from the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. Ayala was convicted of triple homicide in 1988, and he is currently on death row in California. He argues that his trial was fundamentally unfair, and federal habeas relief is therefore warranted, primarily because his lawyer unreasonably failed to impeach the prosecution's key witnesses with evidence that would have undermined their credibility. Ayala also claims that the State concealed evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), that a San Diego police officer threatened and intimidated witnesses, and that the trial court committed several constitutional errors. Because we conclude the California Supreme Court's resolution of Ayala's claims was not contrary to clearly established federal law, we affirm the

district court's denial of the petition for writ of habeas corpus.[1]

## BACKGROUND

### I.  Facts

On April 26, 1985, Jose Rositas, Marcos Zamora, and Ernesto Dominguez Mendez ("Dominguez") were murdered execution-style in an auto body shop located on 43rd Street in San Diego, California.[2]  *People v. Ayala*, 1 P.3d 3, 11–12 (Cal. 2000).  Pedro "Pete" Castillo was shot at the same time, but not fatally.  He claimed to have been an intended fourth victim who got away.  The 43rd Street body shop was a hub for drug distribution, and Dominguez—the owner of the shop—was an active heroin distributor who may have had connections with heroin suppliers in Mexico.  According to Castillo, the 43rd Street murders were a drug robbery gone wrong.

The murders occurred around 8 p.m.  Within a few hours, San Diego gang intelligence detective Carlos Chacon urged his counterparts in the San Diego homicide unit to investigate brothers Hector and Reynaldo Ayala and their associate Juan Manuel Meza as potential suspects.[3]  Two days later, Pete

---

[1] Ayala did not raise a *Batson v. Kentucky*, 476 U.S. 79 (1986), claim, but another defendant, Ayala's brother Hector, did.  Hector and Ayala were tried separately.  Hector's *Batson* challenge is the subject of *Davis v. Ayala*, 135 S. Ct. 2187 (2015).

[2] We refer to this crime as the "43rd Street murders."

[3] We refer to Hector Ayala as "Hector," and his brother, petitioner Reynaldo Ayala, as "Ayala."

Castillo identified Ayala, Hector, and Joe Moreno as the perpetrators of the triple homicide. *Id.* at 14.

Ayala was arrested in June of 1985 and charged with three counts of murder, one count of attempted murder, one count of robbery, and three counts of attempted robbery. *See* Cal. Penal Code §§ 187 (murder), 664 (attempt), 211 (robbery). Hector and Joe Moreno were arrested and charged around the same time.

In February 1987, San Diego police officers arrested Juan Manuel Meza for drug distribution. Meza pleaded guilty to possession of cocaine several weeks after his arrest and entered into a plea agreement that provided he would serve four years in prison. Detective Chacon, who knew Meza from childhood, visited Meza in jail several times during the spring of 1987. Meza admitted to Chacon that he helped the Ayalas plan the 43rd Street murders, even though he ultimately did not participate. Meza met with the district attorneys involved in Ayala's case in April or May 1987 and agreed to testify against Ayala, Hector, and Moreno. In the summer of 1987, a district attorney appeared at Meza's sentencing on the drug possession charge. The D.A. asked the judge to sentence Meza pursuant to Cal. Penal Code § 1170(d) so he could "recall the sentence and commitment previously ordered and resentence the defendant" if Meza testified in court proceedings relating to the 43rd Street murders. Cal. Penal Code § 1170(d)(1).

## A. Gang affiliation evidence

Ayala and Hector were believed to be members of the Mexican Mafia—or EME—a prison gang with an active street program that operated throughout southern California,

but all parties agreed that the 43rd Street murders were not gang related. Ayala's lawyers filed a pretrial motion in limine in which they argued that mention of the Mexican Mafia or Ayala's gang affiliation at trial would be unduly prejudicial and of questionable relevance to the case.

The state trial judge was initially disinclined to rule on the motion. He agreed with the prosecution that it would be difficult to rule on the admissibility of gang affiliation evidence before hearing each witness's testimony. The defense team pursued this pre-trial ruling for months, persistently arguing that, without a ruling, they would not be able to "strategize [and] determine what course of action to take with regard to jury selection and cross-examination." The judge ultimately relented and ruled as follows:

> [G]ang affiliation has nothing to do with motive in terms of this particular case, so there will be no testimony concerning motive dealing with the Mexican Mafia. We know that that's not the case.
>
> Gang affiliation has nothing to do with the identity issue that's presented, so there will be no Mexican Mafia testimony concerning gang affiliation.
>
> . . .
>
> Let me indicate this: That with reference to credibility, the court's going to require a 403 hearing if, in fact, we're going to have to get into this, the people see that after cross-

> examination. We'll deal with that on each witness.
>
> If, in fact, the people perceive a need to deal with the credibility issue, then I'm going to do it at side-bar before it goes in front of the jury.
>
> I'm going to further request that the people admonish their witnesses not to voluntarily mention any gang affiliation, that each witness be admonished on that point. . . . They will be admonished on direct.

The trial judge also said he would instruct witnesses not to mention gangs in their cross-examination testimony, but "if the question calls for that response, then so be it." As the trial progressed, the court ruled that each witness could mention "group" or "association" if necessary, but not "EME" or "Mexican Mafia."

### B. The State's case

Ayala's trial began in August 1988 and lasted two months.[4] "The prosecution theorized that the murders resulted from a robbery attempt that failed because it was based on the perpetrators' incorrect speculation that Dominguez had just returned from Mexico with a quantity of narcotics or cash." *Ayala*, 1 P.3d at 12. The State presented

---

[4] Although some of Ayala's pre-trial proceedings were consolidated with those of his brother, the two were tried separately. Ayala was tried first. Hector was tried second and was convicted. Moreno's trial took place after both Ayala's trial and Hector's trial, and he was acquitted on all counts.

minimal physical evidence linking Ayala to the crimes and instead built its case around the testimony of Pete Castillo and Juan Manuel Meza.

Castillo testified that Dominguez and Zamora sold heroin from the shop and that he was also involved in the heroin distribution operation. He described how Ayala and Hector frequented the shop to use and acquire heroin, and told the jury that he saw Ayala, Hector, and Joe Moreno outside of the body shop on the day of the murders, April 26, 1985. *Id.* at 13. At dusk, Castillo looked up from his work on a car and saw Hector pointing a pistol at his head. *Id.* Hector led Castillo into the shop where Dominguez, Zamora, and Rositas were bound by duct tape. *Id.* Castillo testified that Ayala demanded $10,000 from the victims, "or someone was going to die." *Id.* at 14. Castillo volunteered that he had some money in his truck, and Ayala agreed to lead him there. Castillo used this opportunity to escape. He lifted the large shop door, slid under it, and let it slam down behind him. As he ran into the street, someone, likely Ayala or Moreno, fired shots at him, and Castillo was wounded in the back. Castillo fell onto 43rd Street, where police officers found him and rushed him to the hospital. *Id.*

Castillo did not immediately identify the Ayalas or Joe Moreno as the perpetrators of the crime. Rather, "while in the ambulance on the way to the hospital, [he] said he did not know the killers [but] that one of them was wearing a red plaid shirt." *Id.* at 15. The next day at the hospital, Castillo repeated "that one of the killers was wearing a red Pendleton shirt" when he was interviewed by a detective. *Id.* But the day after that, Castillo identified the Ayalas and Joe Moreno as the killers and also picked them out of a photo array. *Id.* at 14.

In addition to providing an eyewitness account of the crimes, Castillo's testimony corroborated the prosecution's theory of the case: He told the jury that Hector inquired about Dominguez's whereabouts roughly a week before the murders when Dominguez was in jail for minor offenses. *Id.* at 12. Pursuant to Dominguez's request, Castillo told Hector that Dominguez was in Mexico rather than revealing that he was in jail. *Id.*

Juan Meza was also an important witness for the State because he testified that he helped plan the murders before backing out on the day of the crime. Meza told the jury that he and Hector went to the body shop to acquire drugs more than ten times between January and April 1985. He explained that about three weeks before the murders, the Ayala brothers became angry with Dominguez over a drug transaction, and Ayala proposed robbing and killing Dominguez and some of the people who worked with him. Meza testified that in the weeks before the murder, he and the Ayalas talked about Dominguez's trip to Tijuana to buy a large amount of drugs, tying the victims, and the types of guns they would use to commit the crime. Meza also described how, about a week before the murders, Hector recruited Joe Moreno to serve as the getaway driver. Meza testified that he went along with the Ayalas' plan but he never intended to participate in the murders because he feared the Ayalas would use the crime as an opportunity to kill him. According to Meza, Hector told him to be ready to be picked up on April 26 between 5 and 6 p.m., but Meza avoided his home at the appointed time.

*C.  The defense*

The defense presented evidence that "Castillo was in league with the probable actual killers: two young Latino men, one of whom was wearing a red plaid shirt of the Pendleton brand or type." *Id.* at 15.  The defense also focused on raising reasonable doubt by discrediting the State's primary witnesses.

Ayala's trial counsel offered the testimony of Traci Pittman in support of the defense's alternative-assailant theory.  Pittman testified that on the night of the murders she was at a liquor store across 43rd Street and a young Mexican man wearing a Pendleton-type shirt walked past her.  *Id.*  She thought he was concealing something that could have been a gun.  *Id.*  Pittman said the Mexican man was joined by a second Mexican-looking man, and the two disappeared into the complex containing the body shop.  *Id.*  Two minutes later, Pittman heard gunshots, saw a man—presumably Castillo—running from the body shop, and then heard several more shots.  *Id.*  At trial, defense counsel asked Pittman whether Ayala was one of the men she saw the night of the murder, and Pittman answered "no."  Pittman's testimony corroborated Castillo's initial identification of the killer as someone (not Hector or Reynaldo Ayala) who was wearing a red, Pendleton-style shirt.

The defense also called Rafael Mendoza Lopez ("Rafa") as a witness.  Rafa was a long-time friend of Dominguez who frequented the body shop to purchase drugs.  *Id.* at 15–16.  On direct examination, Rafa testified that he went to the body shop on the day of the murders to get heroin from Castillo, and he saw several strangers whom he perceived to be from Mexico.  Rafa testified that he did not see the Ayalas at the

shop that day. Rafa described standing next to Castillo when Castillo opened the trunk of a car and took out two guns that were buried in a pile of dirty clothes. Rafa recalled Castillo telling him "that he was waiting for some people from Mexico."

The defense endeavored to weaken the State's case by impeaching its primary witnesses, Castillo and Meza. Counsel cross-examined Castillo about his role in the body shop's drug distribution business and false statements he made during the preliminary hearing in which he denied any knowledge of drug-related activity at the body shop. *Id.* at 14–15. The defense emphasized that Castillo did not initially identify Ayala as the killer, but rather said the killer was a stranger "wearing a red Pendleton shirt." *Id.* at 15. Counsel impeached Meza with the fact that he was testifying in the hope of getting his sentence reduced, inconsistencies in his story, that it took more than a year for him to come forward, meetings he had with Chacon before deciding to testify, and a statement he made to his parole officer in which he admitted he had a propensity for lying.

### D. The State's rebuttal

Rafa dramatically recanted his testimony in the prosecution's rebuttal. Called back to the witness stand, he told the jury that he invented the story about Castillo taking guns from the trunk of a car and commenting about waiting for people "from Mexico." He also admitted, contrary to his earlier account, that he did see the Ayalas at the body shop late in the afternoon on the day of the murders.

When asked why he lied on Ayala's behalf, Rafa testified that he did it because Ayala asked him to, and because he was

afraid that if he refused to help the Ayalas, he "might, you know, get killed or something." According to Rafa, Ayala asked him to testify falsely for the defense at a jailhouse visit that occurred shortly after Ayala's arrest in the summer of 1985. Rafa explained that Ayala pressed a piece of paper against the visiting room glass separator. A handwritten note on the paper instructed Rafa to get in touch with a defense investigator and tell him "that [the Ayalas] weren't [at the shop] on that date, make it seem like it was some Mexicans from across the border that Pete [Castillo] had hired to come and do the hit." Rafa testified that the note described the guns Rafa should connect with Castillo and said: "[w]hat happened to Chacho [Dominguez] had to happen."

Lead defense counsel vigorously cross-examined Rafa about his flip-flopped testimony. Counsel questioned the plausibility of Rafa's meeting with Ayala, including how Ayala could write such intricate directions on a piece of paper small enough to avoid detection by prison guards. *Id.* at 16. She also introduced evidence that cast doubt on the credibility of Rafa's recantation. *Id.* In particular, though Rafa testified that a person with the nickname "Rudy Green Eyes" Ybarra accompanied him on the visit to see Ayala in jail, counsel showed that "Rudy Green Eyes" was incarcerated at that time. *Id.*

Defense counsel also explored a meeting Rafa had with Detective Chacon during which, counsel believed, Chacon coerced Rafa into recanting. Chacon visited Rafa shortly after Rafa testified for the defense, when Rafa was in a holding cell awaiting transport back to prison. During this visit, Chacon accused Rafa of perjuring himself to get into the good graces of the prison's "Southern" group, with which Ayala was affiliated. Chacon told Rafa he believed this effort

failed and that Rafa would face danger from both the "Southern" group and a rival "Northern" group once he returned to prison. Rafa admitted that Chacon discussed protecting him against these groups, and defense counsel accused Rafa of trading his testimony for the relative safety Chacon promised. On redirect, Rafa confirmed that he feared the "Southern" and "Northern" groups and believed Ayala had "influence over what other people in this Southern group might do," but he denied that Chacon frightened him into recanting his testimony. Rafa maintained that he willingly told Chacon the truth because he was angry that people affiliated with Ayala "show[ed him] no kind of respect" even after he promised to lie on Ayala's behalf.

### E. Detective Carlos Chacon

Detective Carlos Chacon testified only briefly at trial, but Ayala argues that Chacon played a significant behind-the-scenes role in this case. Chacon was a San Diego gang intelligence officer whose regular duties required that he gather intelligence about prison gangs operating in southern California, including the Mexican Mafia. Chacon had pre-trial contact with several of the witnesses in Ayala's trial.

In addition to meeting with Rafa just before he agreed to recant the testimony he gave on Ayala's behalf, Chacon visited Juan Meza after Meza's February 1987 drug arrest, and the two discussed the 43rd Street murders. Meza was a Mexican Mafia affiliate who spent much of the decade between 1975 and 1985 in prison. Chacon was well acquainted with Meza because the two grew up in the same neighborhood. Chacon frequently visited Meza in jail to elicit information about gangs. Several weeks after one such visit, Meza admitted to his involvement in planning the 43rd

Street murders, and several months after that, he agreed to testify against the Ayalas.

### F. The verdict

After deliberating for less than a week, the jury found Ayala guilty of all charges. *Id.* at 11. The trial court sentenced him to death in early January 1989, and Ayala appealed.

Ayala filed a state habeas corpus petition in the California Supreme Court while his direct appeal was pending. The petition raised several claims for relief and requested an evidentiary hearing. The California Supreme Court decided Ayala's direct appeal in June 2000, affirming Ayala's conviction and sentence in a reasoned opinion. *See id.* at 52. The California Supreme Court summarily denied Ayala's habeas corpus petition on the same day. Ayala's conviction became final on March 5, 2001, when the United States Supreme Court denied his petition for writ of certiorari. *See Ayala v. California*, 532 U.S. 908 (2001) (mem.).

## II. Procedural history

Ayala timely filed a federal habeas corpus petition in the Southern District of California. Shortly thereafter, the district court stayed the federal proceedings so Ayala could return to state court and exhaust several of his claims.

Ayala filed his first amended petition for writ of habeas corpus (henceforth, "Exhaustion Petition") in the California Supreme Court in September 2002. He filed two exhibits with his Exhaustion Petition: (1) a declaration by defense investigator Eric Hart; and (2) a declaration by *Strickland*

expert Steven L. Harmon. He also requested an evidentiary hearing. The California Supreme Court summarily denied each of Ayala's claims on the merits the following year. "[S]eperately and independently," the court found many of Ayala's claims to be procedurally barred as untimely.

Ayala then filed a first amended petition for writ of habeas corpus in federal district court in which he asserted seventy-five claims for relief. Between February 2008 and June 2009, the district court issued three orders resolving cross-motions for summary judgment on most of Ayala's claims. The court decided that some of Ayala's ineffective assistance of counsel and witness intimidation claims were potentially meritorious, and it granted Ayala's request for an evidentiary hearing on them.[5]

The district court's evidentiary hearing on Ayala's ineffective assistance of counsel and witness intimidation claims spanned twenty court days over a period of nine months in 2010. The district court took testimony from about twenty witnesses, and the parties introduced nearly 120 exhibits. Following this hearing, Ayala filed a third amended habeas corpus petition for the sole purpose of adding a new claim, the seventy-sixth, based on testimony adduced at the hearing.

On March 28, 2013, the district court issued a lengthy, well-reasoned order granting the State's motion for summary judgment on Ayala's remaining exhausted claims. *See Ayala v. Chappell*, No. 01CV0741-BTM (MDD), 2013 WL 1315127 (S.D. Cal. Mar. 28, 2013). In a separate order, it granted the State's motion for summary judgment, and denied

---

[5] The hearing covered claims 4, 5, 8, 12, 18, 19, 20, and 24.

Ayala's request for a certificate of appealability (COA), on Ayala's unexhausted seventy-sixth claim. The court issued a final judgment and granted a COA on twenty-six claims, including sixteen of the seventeen claims raised here. Ayala timely filed a notice of appeal. We have jurisdiction under 28 U.S.C. § 1291.

## LEGAL STANDARDS

We review de novo the district court's denial of Ayala's habeas corpus petition. *Hurles v. Ryan*, 752 F.3d 768, 777 (9th Cir. 2014).

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs Ayala's petition because he filed it after 1996. AEDPA substantially limits the power of federal courts to grant habeas relief to state prisoners. *See id.* Under AEDPA, a federal court may not grant a prisoner's petition on a claim that was decided on the merits in state court unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Glebe v. Frost*, 135 S. Ct. 429, 430 (2014).

"'[C]learly established Federal law' . . . is the governing legal principle or principles set forth by the Supreme Court [in its holdings] at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003). A state court's decision is contrary to clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). A state court's decision is an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407–08. A state court's factual findings are unreasonable if "reasonable minds reviewing the record" could not agree with them. *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015) (alteration omitted) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). In any case, "[f]or relief to be granted, a state court merits ruling must be 'so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement.'" *Bemore v. Chappell*, 788 F.3d 1151, 1160 (9th Cir. 2015) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

When considering whether a state court's decision was unreasonable under § 2254(d)(1), we may consider only "the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181

(2011).**[6]**  But if we determine "the petitioner has satisfied § 2254(d)" based only on the evidence that was before the state court, "we evaluate the claim de novo, and we may consider evidence properly presented for the first time in federal court." *Crittenden v. Chappell*, 804 F.3d 998, 1010 (9th Cir. 2015) (quoting *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014)).

We apply AEDPA's standards to the state court's last reasoned decision on the merits of a petitioner's claims. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  The California Supreme Court decided seven of the claims at issue here in its reasoned decision on direct review.  *See Ayala*, 1 P.3d at 17–42, 48–52.  Ayala raised the remaining claims in his Exhaustion Petition, so the only merits decision on those claims is the California Supreme Court's September 2003 summary denial.  *See Harrington*, 562 U.S. at 98 (holding that a summary denial from the California Supreme Court is an "adjudicat[ion] on the merits" under AEDPA).  For claims that the California Supreme Court decided on direct appeal, "we apply AEDPA deference to the state court's analysis." *Bemore*, 788 F.3d at 1161.  For claims that the California court addressed only in its summary denial, "we conduct an independent review of the record to 'determine what arguments or theories . . . could have supported [] the state court's decision.'" *Id.* (quoting *Harrington*, 562 U.S. at 102) (alterations in original); *see also Cannedy v. Adams*, 706 F.3d 1148, 1157–59 (9th Cir. 2013) (for claims addressed both in a summary denial and a

---

**[6]** The Supreme Court issued its decision in *Pinholster* after the district court completed the 2010 evidentiary hearing in Ayala's case but before it issued its final summary judgment order.

reasoned opinion, we "look through" the summary denial to review the reasoned decision).

## DISCUSSION

## I.  Procedural bar

We first address the State's threshold argument that the procedural bar doctrine prevents us from reaching the merits on several of Ayala's claims.  The procedural bar doctrine prohibits a federal court from granting relief on the merits of a state prisoner's federal claim when the state court denied the claim based on an independent and adequate state procedural rule.  *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991).  The doctrine is implicated where, as here, the state court's "reliance upon [the state's] procedural bar rule was an independent and alternative basis for its denial of the petition."  *Loveland v. Hatcher*, 231 F.3d 640, 643 (9th Cir. 2000).  Even if the procedural bar doctrine otherwise precludes relief on a prisoner's claim, he or she "may obtain federal review of [that] claim by showing cause for the default and prejudice from a violation of federal law." *Martinez v. Ryan*, 132 S. Ct. 1309, 1316 (2012).

In its 2003 summary denial of Ayala's Exhaustion Petition, the California Supreme Court ruled that many of the seventy-five claims included in the petition were "procedurally barred . . . as untimely" in addition to denying them on the merits.  *See In re Clark*, 855 P.2d 729, 737–62 (Cal. 1993).  The State argued before the district court that the procedural bar doctrine prevented the court from granting

relief on claims the California court dismissed as untimely.[7]
The district court rejected the State's procedural bar
arguments after concluding that "the procedural rules in
question are [not] sufficient to prohibit the consideration of
these claims on the merits."  After the district court issued
this ruling and held an evidentiary hearing on the merits of
Ayala's petition, the Supreme Court decided *Walker v.
Martin*, 562 U.S. 307 (2011).  *Walker* holds that California's
timeliness rule *is* an independent and adequate state law
ground sufficient to bar federal habeas relief on untimely
claims.  *See id.* at 310, 315, 317 (citing *In re Clark*, 855 P.2d
at 738 & n.5).  Citing *Walker*, the State raised the procedural
bar doctrine in its final summary judgment briefing to the
district court.

The district court still declined to resolve Ayala's federal
petition on procedural grounds.  Having concluded the 20-day
evidentiary hearing and foregone defense counsel's offer to
brief cause and prejudice, the court reasoned that "deciding
the merits of [each] claim will prove to be less complicated
and time-consuming than adjudicating the issue of procedural
default."  The district court relied on our decision in *Franklin
v. Johnson*, 290 F.3d 1223 (9th Cir. 2002), to reach the merits
of Ayala's claims.  *Id.* at 1232 ("[C]ourts are empowered to,

---

[7] The California court also rejected many claims as successive and/or
repetitive of issues previously raised, but before our court, the State asserts
procedural bars based only on timeliness grounds, and only as to claims
1, 4, 6, 12, 18, and 20.   Any argument that additional claims are
procedurally barred because they were successive, repetitive, or untimely
is therefore waived.  *See Slovik v. Yates*, 556 F.3d 747, 751 n.4 (9th Cir.
2009) (declining to reach a procedural bar argument the state raised for the
first time in a petition for rehearing); *Vang v. Nevada*, 329 F.3d 1069,
1073 (9th Cir. 2003) (noting that procedural bar is subject to waiver by the
state).

and in some cases should, reach the merits of habeas petitions if they are . . . clearly not meritorious despite an asserted procedural bar.").

The State renews its procedural bar argument here, and we follow the same tack as the district court. The State is correct that *Walker* precludes relief on several of Ayala's claims unless Ayala demonstrates cause and prejudice for his procedural default, *see Walker*, 562 U.S. at 316, but the parties did not develop a record on cause and prejudice. *See, e.g.*, *Loveland*, 231 F.3d at 644–45 (remanding for the district court to hold an evidentiary hearing on cause and prejudice). Thus, in keeping with *Franklin*'s admonishment that where claims are "clearly not meritorious," "appeals courts are empowered to, and in some cases should, reach the merits of habeas petitions . . . despite an asserted procedural bar," 290 F.3d at 1232, we proceed to evaluate Ayala's claims on the merits.

## II. Ineffective assistance of counsel

Ayala first argues that his defense team was constitutionally ineffective because his lawyers failed to present evidence that would have called into question the credibility of key prosecution witnesses Meza and Castillo.[8] More specifically, Ayala claims trial counsel unreasonably declined to call witnesses: (1) Richard Savocchio and Raul Garcia, who would have testified that Meza invented his story about the Ayalas' participation in the 43rd Street murders to obtain a reduction in his own custodial time, and (2) Johnny Mendez and Luis Garcia, who would have testified that

---

[8] Ayala draws this argument from claims 18, 19, and 20.

Castillo "had, prior to the murders, solicited [them] to kill victim Zamora."

"The clearly established federal law for ineffective assistance of counsel ["IAC"] claims, as determined by the Supreme Court, is *Strickland v. Washington*, 466 U.S. 668 (1984) . . . ." *Andrews v. Davis*, 798 F.3d 759, 774 (9th Cir. 2015). To prevail on an IAC claim, a defendant must establish that his counsel's performance was constitutionally deficient, and that "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. *Strickland*'s "deficient performance" prong requires a defendant to show "that counsel's representation fell below an objective standard of reasonableness" such that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687–88. In evaluating a lawyer's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). *Strickland*'s "prejudice" prong requires a defendant to show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"Under the AEDPA, the primary issue is whether the state court adjudication of the *Strickland* claim[] was objectively reasonable." *Woods v. Sinclair*, 764 F.3d 1109, 1131 (9th Cir. 2014). "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two

apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (citations omitted). Thus, even if we would find, on de novo review, that petitioner can satisfy both *Strickland* prongs, "AEDPA requires that a federal court find the state court's contrary conclusions . . . objectively unreasonable before granting habeas relief." *Woods*, 764 F.3d at 1132.

## A. The defense team's "no-gang" approach

Long before trial started, Ayala's defense team decided on a plan to insulate the jury from hearing evidence that Ayala was affiliated with the Mexican Mafia. This plan informed defense counsels' decisions not to present the testimony of several impeachment witnesses whom they believed were affiliated with prison gangs. Ayala now argues that his lawyers' decisions not to call these witnesses amounted to deficient performance under *Strickland*, and that the California Supreme Court's denial of this IAC claim was unreasonable. We analyze this argument by considering first whether the California Supreme Court reasonably applied *Strickland*'s deferential standard when it upheld the defense's "no-gang" trial plan, and then whether the defense team's decision not to call individual witnesses was consistent with the plan.

The California court did not evaluate counsels' overall "no-gang" plan in a reasoned decision, so we "determine what arguments or theories . . . could have supported[] the state court's decision[] and then . . . ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court. *Harrington*, 562 U.S. at 102. We conclude that the California Supreme Court reasonably

deferred to defense counsels' choices regarding exclusion of gang affiliation evidence.

The record leaves no doubt that counsels' effort to avoid mention of the Mexican Mafia or EME at trial was a carefully considered, deliberately undertaken strategy, the likes of which we cannot second-guess on federal habeas review. In *People v. Cardenas*, 647 P.2d 569 (Cal. 1982), the California Supreme Court recognized that gang affiliation evidence is prejudicial because it invites a jury to find a defendant guilty by association. *Id.* at 572. Ayala's lawyers cited *Cardenas*'s progeny in their motion in limine to exclude gang affiliation evidence, where they argued that mention of the Mexican Mafia would unduly prejudice Ayala.[9] They attached to their motion dozens of newspaper articles documenting the prevalence of gang violence in Southern California, and argued that jurors would likely have negative impressions of gangs. Counsel doggedly pursued a ruling on this motion in limine for nearly a year, insisting that without a ruling the defense would be unable to "strategize [and] determine what course of action to take with regard to jury selection and cross-examination." In light of community awareness of gang-related violence in San Diego in the mid-1980s, we cannot say that the defense trial team's decision to insulate the jury from Ayala's gang affiliation was unreasonable, nor are we persuaded that the California Supreme Court

---

[9] Ayala argues that his counsel were ineffective because they overlooked key California cases, namely *Cardenas* and *People v. Munoz*, 204 Cal. Rptr. 271, 278 (Cal. Ct. App. 1984), which held that the prosecution could inquire into a witness's gang membership only by using euphemisms like "groups" or "affiliation." The record does not show that counsel overlooked this case law. Counsel cited *Munoz* in the motion in limine, which argued (in part) that neither the State nor its witnesses should be allowed to mention "gang," "Mexican Mafia," or "EME."

unreasonably applied *Strickland* when it deferred to the defense team's informed, strategic choice. *See Harrington*, 562 U.S. at 105.

Ayala nevertheless argues that his lawyers' failure to call witnesses with any connection to a gang was overly cautious and unduly hindered Ayala's defense. We disagree. Ayala's argument assumes that defense counsel could have controlled the extent to which the trial court would have allowed the prosecution to explore a witness's gang affiliation on cross-examination if the subject had been broached on direct examination. But the record refutes that assumption. The trial court did not categorically prohibit all gang-related testimony because, as the court made clear in its ruling on the defense motion in limine, a witness's gang affiliation could be highly relevant to his or her motive to lie on Ayala's behalf. The court correctly ruled that such testimony might be admitted on cross examination if "the people perceive a need to deal with the credibility issue" or "if [a] question calls for that response," and it did not specify whether or to what extent a witness's mention of gangs might open the door to evidence that could connect Ayala to the Mexican Mafia. And even though the trial court cautioned each witness not to mention the Mexican Mafia, defense counsel risked losing command of a witness's testimony once the witness was on the stand. *See Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1089 (9th Cir. 2010) (en banc) (recognizing the inherent unpredictability in presenting witness testimony). For these reasons, calling any witness with a gang connection necessarily entailed some risk of tainting Ayala in the jury's eyes, and the defense team's cautious approach to these witnesses was well within the broad "range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see also id.* at 690 ("[S]trategic choices made after thorough

investigation of law and facts relevant to plausible options are virtually unchallengeable.").

## B.  Counsel's decision not to call Richard Savocchio

Ayala's primary IAC claim is that his lawyers were constitutionally ineffective because they failed to impeach Juan Meza with the testimony of inmate Richard Savocchio.

Defense counsel subpoenaed Savocchio in anticipation of his testifying on Ayala's behalf.  Savocchio's prison file showed that he had some sort of problem with the Mexican Mafia while incarcerated so, consistent with its pre-trial ruling, the trial court required him to testify at a hearing outside of the jury's presence to determine the extent to which he could be impeached before the jury with evidence of gang ties.  *Ayala*, 1 P.3d at 31.

Savocchio said that he and Meza were incarcerated together after the 43rd Street murders and that Meza told him: "these guys [the Ayalas] are going down anyhow, and I'm going to get something out of it.  It's all bullshit.  I don't know anything about it, they are going anyways."  Defense counsel argued that "Savocchio understood the meaning of the conversation to be that Mr. Meza was cutting a deal for himself to testify in the case about which he knew nothing." The prosecution and the defense both asked Savocchio about the gang notation in his prison file, and Savocchio denied any gang affiliation.  He testified that he was not acquainted with any Mexican Mafia members.  Savocchio explained that the gang notation in his file related to a lie he told years earlier: In order to manipulate a transfer out of Folsom State Prison, he falsely claimed he owed a debt to a Mexican Mafia member incarcerated there.

After hearing Savocchio's testimony outside the presence of the jury, the trial court ruled that if the defense called Savocchio to testify, the prosecution would be allowed to impeach Savocchio with his admission that he lied to prison officials and that the lie involved the Mexican Mafia. The defense expressed concern that the prosecutor's cross-examination about the Mexican Mafia might backfire and harm Ayala and so decided against calling Savocchio.

Ayala argued on direct appeal that his trial counsel was constitutionally ineffective for declining to call Savocchio, and the California Supreme Court rejected this argument in a reasoned decision. *Id.* at 32–33. Ayala raised the same Savocchio-based IAC claim on federal habeas review with slightly better results. The district court ruled that the California Supreme Court's resolution of this claim was unreasonable under 28 U.S.C. § 2254(d)(1) because the state court's rationale for denying it was inconsistent with its reasoning on a related evidentiary ruling.[10] The district court

---

[10] Ayala also argued on direct appeal that any mention of the Mexican Mafia would have been "substantially more prejudicial than probative," and that the trial court erred when it ruled that, if the defense called Savocchio, the prosecution could impeach him with evidence that he lied about having a problem with the Mexican Mafia. *Ayala*, 1 P.3d at 32 (citing Cal. Evid. Code § 352). The California Supreme Court was not persuaded. It reasoned, "Savocchio would have been impeached, if at all, with evidence that he was *not* in a prison gang." *Id.* The California court "fail[ed] to discern how [Savocchio's testimony] would link defendant with the Mexican Mafia in the jurors' minds." *Id.* The district court ruled that this rationale was irreconcilable with the state court's simultaneous dismissal of Ayala's Savocchio-related IAC claim because, in dismissing the IAC claim, the California court implicitly recognized that Savocchio's testimony about the Mexican Mafia could have harmed Ayala. The district court's point is well taken, *compare id.*, *with id.* at 33, but we are not persuaded that the state court's decision was unreasonable within the

reviewed de novo Ayala's claim that his lawyers were ineffective for failing to call Savocchio and still denied relief. After thoroughly examining the record, including new evidence Ayala adduced at the 2010 evidentiary hearing, the district court concluded that counsels' decision regarding Savocchio did not prejudice Ayala.  Ayala renews this IAC claim in our court, pressing his strongest theory:  if nothing else, Ayala argues, the defense should have reopened its case to call Savocchio after Rafa recanted because at that point the jury must have known Ayala was affiliated with a gang, and there would have been nothing to lose by allowing the jury to hear Savocchio's anticipated reference to the Mexican Mafia.

We agree that the cost-benefit analysis associated with Savocchio's testimony significantly changed after Rafa recanted.  Recalled to the witness stand by the prosecutor, Rafa told the jury that he had seen the Ayala brothers at the shop on the day of the murders and that he lied when he said otherwise because Ayala asked him to.  He testified that he knew of (and feared) the "Northern group" and the "Southern group" at Donovan State Prison.  When asked by the prosecutor whether he "believe[d] that the defendant in this case has any influence over what other people in this Southern group might do, as it pertains to you," Rafa answered "[y]es."  He also said he initially testified for Ayala because he was afraid that if he did not "cooperate with" the Ayalas he might "get killed or something."  Rafa's recantation certainly marked a sea change in the trial, but we are not convinced that his testimony about the "Southern" and "Northern" groups inevitably led the jury to conclude that

meaning of § 2254(d)(1), because, as the California Supreme Court recognized, *any* mention of the Mexican Mafia—even one seemingly unrelated to Ayala—could have undermined counsel's "no-gang" strategy.

Ayala was personally affiliated with the Mexican Mafia. The questions about "Northern" and "Southern" groups occupied a relatively small part of Rafa's testimony, neither Rafa nor counsel used the words "gang," "EME," or "Mexican Mafia," and from our review of the record it is not clear that the jury would have equated these prison groups with the street gangs that had received notoriety in southern California at the time of the trial. In this sense, defense counsel's "no-gang" strategy may have partially survived Rafa's testimony.

More importantly, counsel did not make their decision regarding Savocchio in a vacuum but instead had to gauge the likely value to be gained from Savocchio's testimony. Even after Rafa recanted, there were several reasons to think that Savocchio's testimony might have been more harmful than helpful: (1) Savocchio did not have a close relationship with Meza before Meza allegedly admitted to him that he was testifying falsely against Ayala, and it is unclear why Meza would have chosen to confide in Savocchio; (2) Savocchio's testimony that he knew almost nothing about prison gangs despite spending most of his life in prison may have appeared unbelievable; (3) Savocchio had a number of prior convictions; and (4) Savocchio admitted that he lied to prison officials to get transferred to another prison. For these reasons, defense counsel had good reason to question whether the jury would have believed Savocchio and thus whether Savocchio's testimony would have *effectively* impeached Meza. And calling Savocchio to testify entailed the certain, if unquantifiable, risk that the prosecutor's cross-examination would concretely link Ayala to the Mexican Mafia. We have held that when "the risks associated with calling [certain witnesses] to testify outweighed the potential benefits . . . it is reasonable to conclude that counsel wasn't ineffective in

failing to call" those witnesses. *Zapien v. Martel*, 805 F.3d 862, 870 (9th Cir. 2015).

The California Supreme Court denied this claim because it reasoned that defense counsel believed their "victory regarding mention of gangs" was intact even after Rafa recanted. *See Ayala*, 1 P.3d at 33. We agree that defense's "no-gang" plan was probably preserved to some degree, but we also acknowledge that Rafa's recantation left the defense scrambling. Outside of the jury's presence, defense counsel sought a continuance because Rafa's changed testimony altered "the entire complexion of the case." But the defense ultimately elected not to abandon the "no-gang" strategy and we cannot find statements in the state court record in which counsel or the court acknowledged that Rafa's testimony revealed Ayala's gang affiliation to the jury.

We owe considerable deference to the California Supreme Court under the standards dictated by AEDPA, *see Glebe*, 135 S. Ct. at 430, and the California Supreme Court owed considerable deference to defense counsel under the standards dictated by *Strickland*, *see Harrington*, 562 U.S. at 105. There is room for fairminded jurists to disagree about whether defense counsels' decision not to call Savocchio to testify fell below an objectively reasonable standard of care. *See id.* at 103. More to the point, even if we agreed with the district court that the California court's analysis of Savocchio's testimony was internally inconsistent and therefore unreasonable under AEDPA, we also agree with the district court that, reviewed de novo, this claim does not entitle Ayala to relief.

On de novo review we consider evidence the parties elicited at the 2010 evidentiary hearing. *See Crittenden*,

804 F.3d at 1010.  This evidence substantially undermines Ayala's Savocchio-based IAC claim.  In 2010, Savocchio admitted that he *did* owe a debt to someone affiliated with the Mexican Mafia around the time of Ayala's trial.  Savocchio testified at the evidentiary hearing that he embellished the details of his connection to the Mexican Mafia in the 1980s to secure the transfer to another prison, but he denied that he wholly invented his fear of the gang.  It is impossible to know which version of history Savocchio would have told if defense counsel had called him to testify at trial, but if Savocchio told the jury that his fear of the Mexican Mafia was real—which is what he said during the 2010 hearing—the prosecutor surely would have asked whether this fear motivated him to testify on Ayala's behalf.  Even after Rafa recanted, this line of questioning would have damaged Ayala in two ways: (1) the jury would have had another reason to disbelieve Savocchio; and (2) it would have crystalized the impression that Ayala was a dangerous gang member thereby suggesting guilt by association.

Defense counsel also testified at the 2010 hearing.  Lead counsel confirmed that she initially chose not to call Savocchio because she was unsure whether his testimony would open the door to damaging gang affiliation evidence:

> [T]he judge made it clear that if Mr. Savocchio testified he was going to allow impeachment with regard to the EME issue; in other words, whatever relationship Mr. Savocchio had or didn't, whether real or something he had made up, about the EME, and that it was going to open the door in a specific way to the gang issue that we had been attempting to keep out of the case.

Lead counsel explained that she reviewed Savocchio's prison file with him before the 1988 in limine hearing, and although she lacked specific recollection of her pre-trial meeting with Savocchio, she surmised that she was aware of his debt to someone connected with the Mexican Mafia.

Counsel acknowledged at the 2010 hearing that she would have pursued a different trial strategy if she had known Rafa was going to recant. But as we have observed, counsel could not have known this would happen; indeed, Rafa's recantation was a devastating development for the defense because it came so late in the trial and counsel built their defense on a "no-gang" strategy. From the outset, the defense team prepared with the aim of keeping evidence of Ayala's gang affiliation from the jury. This meant that the defense team did not extensively voir dire the jury on their attitudes about gangs because they did not want to suggest that the 43rd Street murders were gang related. It also meant the defense did not present expert testimony to explain the distinction between prison gangs and street gangs, or that Ayala's gang was different from those that terrorized southern California in the mid-1980s. After Rafa recanted, the defense requested and received a continuance to regroup. It considered abandoning its "no-gang" strategy, but it had no voire dire record from which to predict how the jury would react and no expert testimony that might have allowed it to contextualize Ayala's participation in the Mexican Mafia. Worse, shifting strategies would have forced counsel to admit to the jury that the defense withheld key facts about Ayala's gang-involvement. Ayala does not explain how defense counsel could have completed such a maneuver without ruining her credibility with the jury, and Ayala's own *Strickland* expert acknowledged that "[t]he credibility of counsel during all phases of a trial . . . is absolutely crucial."

In sum, we agree with the district court that the initial decision not to present Savocchio's testimony did not fall below an objective standard of reasonableness. *See Bemore*, 788 F.3d at 1163 ("[A] tactical decision may constitute constitutionally adequate representation even if, in hindsight, a different defense might have fared better."). We also agree with the district court's analysis of counsel's decision not to reopen the defense case after Rafa testified. In light of the risks and difficulties presented by pivoting away from a "no-gang" strategy, the decision not to make such a dramatic transition did not fall below an objectively reasonable standard of care. Indeed, a holding to the contrary would be the type of "Monday morning quarterbacking" *Strickland* prohibits. *See Strickland*, 466 U.S. at 689 (reviewing courts must "eliminate the distorting effects of hindsight"). Habeas relief is not warranted on this claim.[11]

## C. Counsel's decision not to call "other witnesses"

Ayala also argues that trial counsel was ineffective for failing to impeach: (1) Meza by calling inmate Raul Garcia to testify that Meza admitted to knowing nothing about the 43rd Street murders; and (2) Castillo, with evidence that he solicited Juan Mendez (and possibly Luis "Bobo" Garcia) to kill victim Zamora in the months before the murders.

---

[11] Ayala also argues that trial counsel was ineffective by failing to impeach Meza with evidence about his past involvement with gangs and longstanding relationship with Detective Chacon. The record refutes this claim. Trial counsel thoroughly impeached Meza. She avoided certain topics—such as Meza's former status as a Mexican Mafia member and his friendly relationship with Detective Chacon, a gang intelligence officer—because cross-examination on those topics would have permitted the State to inquire, on re-direct, about Meza's (and Ayala's) Mexican Mafia affiliation.

Ayala did not name these "other witnesses" in his Exhaustion Petition or in the declarations he filed with the California Supreme Court.  There, he alleged only that counsel was ineffective for failing to impeach Meza with evidence that he "had confessed to numerous witnesses, including Richard Sovacchio [sic] among many others – known to Petitioner's counsel" that he had no idea wither Petitioner had actually participated in the 43rd street murders. Similarly, Ayala's Exhaustion Petition and the supporting declarations alleged only that counsel was ineffective for failing to impeach Castillo with evidence that he "had, prior to the murders, solicited two different witnesses to kill victim Zamora."  Under *Pinholster*, we review these IAC claims as Ayala presented them to the California Supreme Court. 563 U.S. at 187 n.11 ("Even if the evidence adduced in the District Court additionally supports [a claim presented to the state court], we are precluded from considering it."). Therefore, we do not consider evidence that specific individuals—including Raul Garcia, Mendez, and Luis Garcia—were willing to testify on Ayala's behalf in 1988. *See id*. at 181 ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.").[12]

The California Supreme Court did not unreasonably deny Ayala's IAC claims as they relate to "other witnesses." Ayala did not allege in the California court that counsel could

---

[12] Because the California Supreme Court summarily denied these IAC claims, we "determine what arguments or theories . . . could have supported . . . the state court's decision; and then . . . ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court.  *Harrington*, 562 U.S. at 102.

have presented the testimony of these witnesses without wrecking their "no-gang" defense plan. To the contrary, Ayala admitted in his Exhaustion Petition that counsel chose not to call these witnesses because counsel believed the witnesses were gang-affiliated. Just as we conclude that counsel's decision to insulate the jury from mention of the Mexican Mafia was "sound trial strategy," *Strickland*, 466 U.S. at 689, we conclude that decisions counsel made to implement this strategy, like declining to call gang-affiliated witnesses, were likewise reasonably strategic. *Id.* "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" under *Strickland*. *Id.* at 690. The California Supreme Court's denial of these claims was not an unreasonable application of *Strickland*.

Ayala also argues that defense counsel failed to independently investigate the gang affiliation of numerous witnesses before deciding not to call them. He claims defense counsel entered "into an agreement with the prosecution, whereby counsel provided to the prosecution the names of [Ayala's] prospective witnesses, and would agree not to call certain witnesses upon receiving any representation or threat from the prosecution of possible gang-related affiliations relating to that witness."

Ayala correctly argues that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 690–91). But the record before the state court does not support Ayala's claim that his lawyers abdicated this duty. Instead, it shows that counsel located potential witnesses and sought access to their prison files before

deciding whether to call them to testify. For example, counsel reviewed Savocchio's prison file before he testified at the in limine hearing. And counsel stated during pretrial hearings that she subpoenaed "department of corrections' files" for key witnesses in part to learn whether those witnesses were gang-affiliated. The trial court ordered the State to turn over "[a]ll notes or memoranda, handwritten or typed, by an investigating officer, peace officer, or deputy district attorney of their conversations with any witnesses which is relevant to said witness[es]' credibility," and one of the district attorneys confirmed that her office delivered this discovery, including requested prison files, to the defense team. Because of these efforts by defense counsel, Ayala's case is unlike *Thomas v. Chappell*, a pre-AEDPA case where we granted relief because the defense "conducted no investigation for supporting witnesses or corroborating evidence outside" the community in which the murder took place (and in which petitioner lived), despite sworn testimony that the victims and another suspect came from a different community. 678 F.3d 1086, 1096 (9th Cir. 2012); *see also id.* at 1104 (counsel's "failure to call [the witness] cannot be excused as a tactical decision because [counsel] did not have sufficient information with which to make an informed decision"). Ayala's defense team opted against calling some potential witnesses; it did not overlook them.

To the extent Ayala argues that his lawyers performed deficiently because they relied to some degree on the prosecution's information about potential witnesses, that argument is also without merit. Defense counsel was concerned not only with what prospective witnesses' prison files showed, but also with Detective Chacon's knowledge of witnesses' affiliations that might surface on cross-examination. Counsel were keenly aware of Detective

Chacon's involvement in this prosecution; they knew he was a gang intelligence officer who had kept tabs on several of the prospective witnesses for years before Ayala's trial, and they suspected that Chacon's awareness of potential witnesses' gang affiliations far outstripped the information contained in their prison files. If the prosecution had information tying a prospective witness to gangs, from any source, calling the witness to testify might have opened the door for the State to impeach the witness with evidence of gang-driven bias. For this reason, there is ample room for fairminded disagreement about whether consulting with the prosecution before calling prospective impeachment witnesses was an "error[] so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687; *see also Harrington*, 562 U.S. at 103 (discussing AEDPA deference). The California court reasonably rejected Ayala's failure-to-investigate claim.

But even if we reviewed this claim de novo, Ayala would not be eligible for relief. Defense counsel confirmed during the 2010 evidentiary hearing that she purposely chose not to call many witnesses, including Raul Garcia and Mendez, because those witnesses were or had been gang affiliated. Exhibits Ayala introduced at the 2010 hearing show that counsel investigated these witnesses to evaluate potential exposure to harmful gang affiliation evidence. For example, Ayala submitted defense counsel's pre-trial notes in which she described her impressions of Raul Garcia: "Claims he was approached by Meza to make up a story about the killings. He knows Ronnie well. My reading between the lines is that this is possible B.S. and he is very impeachable re relationship with Ronnie." *Cf. Cannedy v. Adams*, 706 F.3d 1148, 1160–61 (9th Cir. 2013) (granting relief when uncontradicted evidence showed that trial counsel failed to

interview a key witness). Ayala also introduced notes from
defense counsel's pretrial interviews with Juan Mendez in
which she wrote that Mendez "ha[d] been reported in his
prison file [as] . . . EME affiliated," that Mendez knew Ayala
from the prison gang, and that Mendez had done favors for
the gang during his time in prison. These notes show that
trial counsel's decision not to call "numerous witnesses" was
consistent with her trial strategy. *Strickland*, 466 U.S. at 689.
Relief under *Strickland* is not available.

Finally, Ayala asks us to stay his federal proceedings so
he can seek reconsideration of his IAC claims in the
California Supreme Court. *See Gonzalez v. Wong*, 667 F.3d
965, 980 (9th Cir. 2011) (staying federal case to give
petitioner the opportunity to present to the state court
evidence first adduced in federal court). In particular, Ayala
seeks the chance to submit in state court evidence he first
presented in the federal proceedings, including evidence that
Juan Mendez, Raul Garcia, and Luis Garcia were willing to
testify on Ayala's behalf in 1988. But the district court held
an extended evidentiary hearing on Ayala's IAC claims, and
its lengthy and well-reasoned order concluded that Ayala's
petition failed even in light of this newly presented evidence.
*See Ayala v. Chappell*, No. 01CV0741-BTM (MDD), 2013
WL 1315127 (S.D. Cal. Mar. 28, 2013). We agree with the
district court that the 2010 evidence does not strengthen
Ayala's IAC claims, and we decline Ayala's invitation to stay
his federal case.[13]

---

[13] Ayala additionally argues that counsel rendered deficient performance
by declining to call Jesus Aguilar, Javier Frausto, and Sal Colabella,
whose testimony would have corroborated Juan Mendez's story that
Castillo previously solicited people to kill one of the victims. Ayala did
not present these names to the state court, although information about

## D. The state court's fact-finding process

Ayala argues that de novo review of his *Strickland* claims is warranted because the state court's fact-finding process was deficient. He requested an evidentiary hearing in his initial state habeas corpus petition, which the California Supreme Court summarily denied in June 2000, and in his Exhaustion Petition, which the California Supreme Court summarily denied in September 2003. Ayala raised his IAC claims in both state court petitions, and he now argues that it was unreasonable for the California Supreme Court to resolve these claims without first granting him an evidentiary hearing. We disagree.

We have recognized that a state court's decision may be based on an "unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), if "the [fact-finding] process employed by the state court [was] defective," *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004); *see also Woods*, 764 F.3d at 1128. "To find the state court's [fact-finding]

---

these witnesses was in his possession when he filed his Exhaustion Petition. Therefore, under *Pinholster* we cannot consider the testimony of these witnesses, 563 U.S. at 181, and a stay is not proper under *Gonzalez*, 667 F.3d at 979. Shortly before oral argument in our court, Ayala filed a declaration from Travis Chelberg, a newly-identified declarant who participated in a residential drug abuse treatment program with Meza decades after Ayala's trial. Chelberg declares Meza admitted to him that he lied when he testified against the Ayalas. Ayala moves for remand under *Rhines v. Weber*, 544 U.S. 269 (2005), so the district court can review this evidence. *See* ECF No. 61. The motion is denied. We decline to use the stay-and-abeyance procedure outlined in *Rhines* and ordinarily reserved for mixed habeas petitions to allow Ayala to develop his claim based on new evidence. The proper method for obtaining relief is to seek leave to file a second habeas petition. *See* 28 U.S.C. § 2244(b)(3).

process defective . . . 'we must more than merely doubt whether the process operated properly. Rather, we must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate.'" *Hurles*, 752 F.3d at 778 (citation omitted). A state court's denial of a petitioner's request for an evidentiary hearing does not necessarily render its fact-finding procedure defective. *Woods*, 764 F.3d at 1128 (concluding that it "was not unreasonable for the Washington Supreme Court to deny Woods's request for a[n evidentiary] hearing"); *see also Harrington*, 562 U.S. at 97 (denying relief on an IAC claim where the California Supreme Court did not grant petitioner an evidentiary hearing).

Turning first to Ayala's Savocchio-based IAC claim, we have no trouble concluding that the California Supreme Court's decision to deny Ayala an evidentiary hearing was not unreasonable. The record before the California Supreme Court included a complete transcript of the trial court's in limine hearing where defense counsel explained her decision not to call Savocchio as a witness. The California court "reasonably concluded that the evidence already adduced was sufficient to resolve" the question of counsel's performance on this score. *Hibbler v. Benedetti*, 693 F.3d 1140, 1147 (9th Cir. 2012).

We come to the same conclusion on Ayala's IAC claim based on "other witnesses." As explained, Ayala alleged in his Exhaustion Petition that the defense team's "no-gang" strategy drove their decision not to call numerous other impeachment witnesses, and this remains the crux of his IAC argument in our court. The record before the California Supreme Court vividly illustrated that the "no-gang" strategy

was well researched and deliberate, and that decisions counsel made to carry out the strategy, including decisions not to call gang-affiliated witnesses, were likewise reasonable. *See Strickland*, 466 U.S. at 689–90. The California Supreme Court did not need an evidentiary hearing to resolve this IAC claim. *See People v. Duvall*, 886 P.2d 1252, 1258–59 (Cal. 1995) (requiring California courts to assume the truth of a habeas petitioner's non-conclusory allegations); Laurie L. Levenson, *California Criminal Procedure* § 30:25 (2014) ("The court may also deny the petition without a hearing if consideration of the written return and matters of record persuade it that the contentions of the petition lack merit.").[14]

## III.    *Brady* relating to Juan Meza

Ayala's next group of claims arises from *Brady v. Maryland*, 373 U.S. 83 (1963). Ayala argues in these claims that the State failed to disclose impeachment evidence about its key witness, Juan Meza, who testified at trial that Ayala enlisted him to plan and participate in the 43rd Street murders. Ayala argues the State "failed to disclose specific details of Meza's long history as a prosecution informant, his years-long relationship with Chacon as a snitch, the fact that Meza previously denied having any personal knowledge of the 43rd Street murders, and the full extent of the consideration that Meza received for his testimony against

---

[14] Because we conclude that the California Supreme Court reasonably applied *Strickland*'s deficient performance prong when it denied Ayala's IAC claims, we need not decide whether Ayala established prejudice under *Strickland* prong two. *See Cannedy*, 706 F.3d at 1157 ("If the state court reasonably concluded that Petitioner failed to establish either prong of the *Strickland* test, then we cannot grant relief." (footnote omitted)).

Ayala." The State also allegedly concealed evidence that Detective Chacon orchestrated Meza's decision to come forward to testify nearly two years after the murders. This issue draws from several certified claims (namely, claims 5, 6, and 8), but Ayala focused his argument in our court on uncertified claim 76.

Claim 76 arose from Meza's testimony at the 2010 evidentiary hearing wherein he discussed benefits he received in exchange for testifying against Ayala in 1988. Ayala interpreted this hearing testimony as revealing previously undisclosed evidence about Meza's immunity agreement. Ayala raised claim 76 in his third amended habeas corpus petition, asserting that the State failed to disclose the scope of the immunity Meza received in exchange for his trial testimony. The district court granted the State's motion for summary judgment on claim 76, ruling that the claim was unexhausted and lacked merit.

*Brady* is the clearly established law governing the state's duty to disclose impeachment evidence favorable to the defense. 373 U.S. at 87. *Brady* holds that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Id.* "Evidence favorable to [the] accused" includes evidence that would help a defendant impeach prosecution witnesses. *See Giglio v. United States*, 405 U.S. 150, 154–55 (1972). To establish a *Brady* violation, a defendant must show: "(1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the government, regardless of whether the suppression was willful or inadvertent; and (3) the evidence is material to the

guilt or innocence of the defendant." *United States v. Sedaghaty*, 728 F.3d 885, 899 (9th Cir. 2013).

### A. Claim 76

Ayala concedes in his opening brief that claim 76 is unexhausted because it is based on testimony elicited for the first time in federal district court. *See* 28 U.S.C. § 2254(b)(1)(A); *Woods*, 764 F.3d at 1129–30. He asks us to review it on the merits because it is closely connected to several of his exhausted, certified claims, but he cites no authority for this proposition and we cannot create any here. Ayala alternatively asks us to stay his federal proceedings so that he may present claim 76 to the California Supreme Court. He bases this request on our decision in *Gonzalez v. Wong*, 667 F.3d 965 (9th Cir. 2011).

In *Gonzalez*, the State concealed critical impeachment documents until petitioner's state post-conviction proceedings were complete, a flagrant and continuing *Brady* violation. *Id.* at 976. "Because the suppressed materials substantially strengthened the petitioner's *Brady* claim, we remanded that portion of the petitioner's case to the district court, with instructions to stay the habeas proceedings until the petitioner had an opportunity to present the new evidence to the California Supreme Court." *Thompson v. Runnels*, 705 F.3d 1089, 1100 (9th Cir. 2013) (discussing *Gonzalez*). We stayed Gonzales's federal case, thereby enabling him to present this new evidence in state court, because: (1) the evidence first uncovered in federal court gave rise to a potentially meritorious claim; and (2) the petitioner diligently pursued that evidence in the state court. *See Gonzalez*, 667 F.3d at 979–80.

Ayala's case is not analogous to *Gonzalez* because Meza's 2010 hearing testimony did not give rise to a potentially meritorious *Brady* claim. The State disclosed Meza's written immunity agreement to defense counsel before Ayala's trial in 1988, and the agreement was admitted as a trial exhibit. The agreement showed that Meza testified against Ayala in exchange for use and derivative use immunity and a favorable recommendation regarding resentencing on his February 1987 drug conviction. Ayala concedes that the State properly disclosed Meza's *written* agreement, but he argues that Meza and the State also had a broader *unwritten* immunity agreement that was undisclosed at trial. According to Ayala, the State verbally guaranteed it would not prosecute Meza for "anything else [that] came up" during Meza's discussions with the district attorneys about Ayala's case, including past assaults, stabbings, and potentially a murder. Ayala also argues that the unwritten agreement guaranteed Meza's immediate release from custody.

The record does not support Ayala's contention that a broad unwritten agreement ever existed. Ayala's lawyer conceded at oral argument that the only evidence of a "sidebar" immunity agreement is Meza's 2010 evidentiary hearing testimony. That testimony consisted mostly of Meza responding "yes" to leading questions from Ayala's lawyer:

> Q: And part of the agreement was that you would be sentenced to four years, but after you testified you would be released?
>
> A: Mm-hmm.
>
> Q: Is that yes?

A: Yes.

Q: Do you recall also there was some considerable conversation about immunity, that you would be given what is called use and derivative immunity; is that right?

A: Yes.

Q: Just as you sit here today — first of all, do you recall that that was part of the deal, too, was that if you talk to the DA you would be given use and derivative immunity?

A: Mm-hmm.

Q: Is that yes?

A: Yes.

Q: Your recollection, sir, or your understanding of use and/or derivative immunity, what was that? What did that encompass?

A: I guess if anything else came up I wouldn't be charged with it, just in case.

Q: So just in case you were considered, say, a suspect in the 43rd Street robberies and murders, you wouldn't be charged; is that right?

A: Mm-hmm.

Q: Yes?

A: Yes.

. . .

Q: So if anything else came up while you were talking to Dellatore, you wouldn't be charged with any of those things either?

A: Yes.

Contrary to Ayala's claim 76, Meza also testified that, years before Ayala's trial, the State declined to prosecute him for crimes he committed in prison because "they just couldn't prove it," not because of a sweeping, unwritten immunity deal he received in exchange for testifying against Ayala. The record is likewise inconsistent with Ayala's argument that the State promised Meza immediate release from custody:  Exhibits introduced at the 2010 hearing establish that the prosecution *requested* Meza be resentenced on his February 1987 drug arrest, not that any reduction was guaranteed.  This *Brady* claim also fails because Ayala's trial lawyers knew Meza was testifying in the hope of receiving a reduction in his jail time.  Because Meza's 2010 testimony does not persuade us that the State guaranteed Meza immunity or benefits beyond that which it disclosed in 1988, we decline to stay Ayala's federal case, deny claim 76 on the merits, and deny as moot Ayala's request for a COA.

   B.  *Ayala's certified* Brady *claims*

   In his certified *Brady* claims, Ayala argues: (1) "the prosecution failed to disclose all material information

regarding its use of jailhouse snitches with known gang affiliations, including but not limited to Juan Meza"; (2) "[t]he prosecution was aware that Juan Meza had a long term informant relationship with Detective Chacon and that in the years preceding the trial Meza had received favors and/or sweetheart deals for a number of criminal offenses, and that said consideration had been instigated by Detective Chacon"; and (3) the State concealed evidence that Chacon and Meza met several times before Meza decided to testify about his role in planning the 43rd Street murders.

The state court record shows that the government did not conceal this information about Meza. In fact, in his Exhaustion Petition, Ayala asserted that defense counsel knew (and failed to use for impeachment purposes) many facts about Meza that Ayala now claims the government suppressed. The Exhaustion Petition averred:

> [Defense counsel] were aware that:
>
> A. Juan Meza and Detective Carlos Chacon knew each other since 1965; . . .
>
> C. Whenever Juan Meza was incarcerated Detective Chacon would visit him; and these visits were generally unannounced;
>
> D. As a result of this "relationship" . . . Detective Chacon had kept a file on Juan Meza for the ten years preceding the trial;
>
> E. Juan Meza had been a prosecution informant, who received benefits of

shortened and/or lenient sentences for his criminal offenses;

F.  Meza . . . had been in the Mexican Mafia, however he was currently considered a drop out[; and]

G. [V]ery soon after the April 26, 1985 killings, Detective Chacon had visited Meza, while incarcerated, a number of times, but that it was not until February, 1987, after Juan Meza was due to be sentenced to a term of four years in the state penitentiary, and after a visit from Detective Chacon, that Juan Meza surfaced as a witness in the case.

Either counsel knew about these facts and allegations and failed to use them, or the State concealed this information from counsel; Ayala cannot have it both ways.

The trial transcript confirms that counsel knew these facts and allegations. Meza testified outside the jury's presence that he had known Chacon since childhood, and that Chacon frequently visited him in jail. Meza confirmed that Chacon visited him in jail in May or June 1985 but he denied that he and Chacon discussed Meza's involvement in the 43rd Street murders at that meeting. Chacon visited Meza again in February 1987, shortly after Meza was arrested on the unrelated drug charge, and Meza gave Chacon some information about the 43rd Street murders. By April 1987, Meza admitted that he was involved in planning the murders, and by May of that year, Meza told Chacon that he had decided to testify against the Ayalas. Defense counsel questioned Meza about previous "sweetheart" deals he

received because of his relationship with Chacon, but Meza repeatedly denied the existence of such deals, and Ayala points to no evidence that other deals were actually made. Because Ayala has not established that the State suppressed the information that underpins his certified *Brady* claims, the state court's summary denial of them was not unreasonable. *See Sedaghaty*, 728 F.3d at 899 (to establish a *Brady* violation, defendant must show that evidence was "suppressed by the government").

## IV.    *Brady* claims regarding Detective Chacon

Ayala next claims the State violated *Brady* by concealing evidence that Detective Carlos Chacon had a longstanding bias against the Ayala brothers.[15]  Ayala first presented this claim to the California Supreme Court in his Exhaustion Petition, and the California court summarily denied it.  The district court granted the State's motion for summary judgment on this claim, concluding that the California Supreme Court's application of *Brady* was reasonable under 28 U.S.C. § 2254(d)(1).  We affirm.

In support of the claim that Detective Chacon was biased against the Ayala brothers, Ayala alleged the following to the California Supreme Court: (1) Chacon had a long-standing personal grudge against the Ayalas stemming from his belief that the Ayalas were involved in the 1977 murder of Chacon's close friend, Eduardo Cruz; (2) Chacon previously accused the Ayalas of "complicity in many murders previous to the 43rd Street murders"; (3) Chacon was related by marriage to the Sosa family, whose gang—Nuestra Familia— was a rival of the Mexican Mafia's; and (4) the district

---

[15] This argument corresponds to claim 5.

attorneys in charge of Ayala's case considered removing Chacon from the investigation. Ayala submitted a declaration by defense investigator Hart to support these allegations. In it, investigator Hart attested "on information and belief" that Chacon was biased against the Ayalas for each of these reasons.

The state court reasonably rejected this *Brady* claim because Ayala presented no evidence to substantiate his allegation that Detective Chacon harbored bias against him. The spare allegations in Ayala's petition and Hart's unexplained "information and belief" did not identify any evidence the prosecution withheld that might have suggested bias, nor do they describe how Hart had personal knowledge of such bias. *See* Cal. Evid. Code § 702(a) ("[T]he testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter.").[16] With nothing more, the California court need not have determined whether a *Brady* violation occurred or prejudice resulted. *Cf. Milke v. Ryan*, 711 F.3d 998, 1008 (9th Cir. 2013) (granting relief when "Milke presented the state court with hundreds of pages of court records from cases where [the officer] had committed misconduct, either by lying under oath or by violating suspects' *Miranda* and other constitutional rights during interrogations"). We addressed a similarly sparse petition in *Runningeagle v. Ryan* and explained that "to state a *Brady* claim, [a petitioner] is required to do more than 'merely speculate' about" the withheld evidence. 686 F.3d

---

[16] For the reasons stated in the next section, we also affirm the district court's dismissal of claim 5 to the extent Ayala argues that the state concealed evidence that Chacon intimidated Rafa and Jenifer Mendoza Lopez (Rafa's wife). Because Ayala did not establish that the witnesses were intimidated, we conclude there was nothing to disclose.

758, 769 (9th Cir. 2012); *see also Duvall*, 886 P.2d at 1258
("The petition should both (i) state fully and with particularity
the facts on which relief is sought, as well as (ii) include
copies of reasonably available documentary evidence
supporting the claim, including pertinent portions of trial
transcripts and affidavits or declarations." (citations
omitted)). Ayala's failure to identify evidence the State
withheld convinces us that the state court reasonably applied
*Brady* when it denied this claim.[17]

## V. Witness intimidation

Ayala's next claim is primarily a due process-based
witness intimidation claim. Ayala argues that Detective
Chacon intimidated and threatened Rafa and his wife, Jenifer,
and that Rafa recanted his testimony in favor of Ayala as a
result of the threats and intimidation. Ayala also asserts that
the State violated *Napue v. Illinois*, 360 U.S. 264 (1959), by
failing to correct Rafa's testimony that Detective Chacon did
not threaten him.[18]

---

[17] Evidence adduced at the 2010 hearing does not change this
conclusion. *Cf. Gonzalez*, 667 F.3d at 979. In his 2010 testimony,
Chacon denied harboring any bias against the Ayalas. He explained that
he suspected them of the 43rd Street murders and several other murders
based on his study of their actions and whereabouts in his capacity as a
gang intelligence officer. Defense counsel knew of these suspicions
because she subpoenaed Chacon's notes from the night of the murder.
The Ayalas also knew that Chacon suspected them of an earlier murder
because Chacon was actively involved in its investigation. In short, the
2010 evidence does not show that the State concealed exculpatory
evidence about Detective Chacon.

[18] Ayala draws this issue from claims 4 and 8 (which both relate to
witness intimidation) and claim 12 (which is a general *Napue* claim).

As explained, when Ayala initially called Rafa as a defense witness, Rafa's testimony implicated Pete Castillo in the 43rd Street murders and tended to exonerate the Ayalas. Shortly after Rafa testified for Ayala, Detective Chacon visited him in jail, and accused him of lying in court to benefit Ayala. After some discussion about the risks Rafa would face from gangs upon his return to prison, Rafa admitted to Chacon that he lied, and agreed to recant his testimony. Rafa's rebuttal testimony exonerated Castillo and implicated the Ayalas in the 43rd Street murders.[19]

*Webb v. Texas*, 409 U.S. 95 (1972) (per curiam), is the clearly established law governing claims of witness intimidation by government officials. In *Webb*, the trial judge strongly admonished a defense witness about the risks of perjury before the witness testified. *Id.* at 95–96. The judge singled out this witness, telling him:

> If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the liklihood (sic) is that you would get convicted of perjury and that it would be stacked onto what you have already got, so that is the matter you have got to make up your mind on.

*Id.* at 96. The witness chose not to testify. *Id.* The Supreme Court reversed Webb's conviction because "the unnecessarily strong terms used by the judge could well have exerted such

---

[19] Ayala raised these witness intimidation and *Napue* claims before the California Supreme Court in his Exhaustion Petition, and the court summarily denied them. The district court likewise denied relief.

duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify." *Id.* at 98. Because the judge's remarks "effectively drove that witness off the stand," the judge violated the defendant's due process right to present a defense, and reversal of his conviction was warranted. *Id.* Under *Webb*, "[i]t is well established that 'substantial government interference with a defense witness's free and unhampered choice to testify amounts to a violation of due process.'" *Earp v. Ornoski*, 431 F.3d 1158, 1170 (9th Cir. 2005) (quoting *United States v. Vavages*, 151 F.3d 1185, 1188 (9th Cir. 1998)).

The California Supreme Court's rejection of Ayala's witness intimidation claim was not contrary to or an unreasonable application of *Webb*. *See* 28 U.S.C. § 2254(d)(1). The California court had before it Rafa's trial testimony and Hart's declaration when it decided this claim. Hart declared "that Detective Chacon threatened, coerced, manipulated and/or intimidated potential and actual witnesses, including but not limited to" Rafa, and alleged that Chacon accomplished this coercion in part by threatening to investigate Rafa's wife Jenifer for smuggling drugs into prison. Standing alone (and taken as true), these allegations could amount to "substantial . . . interference" with Rafa's choice to testify. *See Earp*, 431 F.3d at 1170. But Hart's declaration does not provide sources for its conclusions, and it was directly contradicted by Rafa's 1988 trial testimony that Chacon did not threaten him. Rafa denied that Chacon told him he was on a hit list and testified that he always knew his life was in danger because of his involvement with gangs. He told the jury "[t]he only thing [Chacon] said [was] . . . 'I don't see why you're helping these people out when you know' — 'they' — you know, 'they don't care about you,' you know." Rafa also denied that Chacon threatened Jenifer

as a way of pressuring him to recant. Rather, he explained that he originally testified for the defense as a favor, but was motivated to recant because, despite his promise to testify, people associated with Ayala tried to engage Jenifer in illegal activity:

> But, you know, after I testified and these people started calling my wife, you know, they wanted her — told her, you know, that I had put him in a spot. They wanted her to go visit somebody else in prison to take them drugs and — . . . so I told them — I started thinking, 'man, I do these guys all these favors,' you know, 'and they don't show me no kind of respect,' you know.

Defense counsel vigorously cross-examined Rafa about whether Chacon threatened or intimidated him into recanting his testimony, but Rafa consistently denied that this was the case. With nothing to support Hart's allegations, the California court did not unreasonably apply *Webb* when it rejected Ayala's witness intimidation claim.[20]

Nor did the California Supreme Court misapply federal law when it rejected Ayala's *Napue* claim. *See Napue*, 360 U.S. at 269 ("[A] conviction obtained through use of false evidence, known to be such by representatives of the

---

[20] Evidence adduced at the 2010 hearing did not strengthen Ayala's witness intimidation claim. Both Jenifer and Rafa testified at the hearing consistent with Rafa's trial testimony. Rafa testified that Chacon and the district attorneys "didn't threaten me or they didn't pressure me to come back and testify against Ronnie." Jenifer likewise denied that Chacon threatened to investigate her for smuggling drugs.

State, must fall under the Fourteenth Amendment."). Ayala only offers Hart's declaration to buttress the allegation that Rafa lied in his recanted testimony, and, as discussed, Rafa's testimony refutes this charge. The California Supreme Court reasonably denied this claim.[21]

## VI.    Other alleged trial court errors

Ayala argues that the trial court committed several other errors that deprived him of certain federal constitutional rights. We address each alleged error in turn.

### A.  Refusal to strike juror Cosgove for cause

Ayala argues that the trial court committed constitutional error when it declined to strike juror Cosgrove for cause.[22] According to Ayala, juror Cosgrove was predisposed to vote for the death penalty and his presence on the jury violated Ayala's due process right to a fair and impartial jury. The California Supreme Court rejected this argument on direct appeal, *see Ayala*, 1 P.3d at 24–25, and the district court denied federal habeas relief.

*Morgan v. Illinois*, 504 U.S. 719 (1992), is the clearly established law applicable to this biased-juror claim. *Morgan*

---

[21] Ayala likewise argues that the State violated *Webb*, *Napue*, and *Brady* because it failed to disclose "a pattern of intimidation and threats directed at [potential prosecution witnesses Richard Buchanan and Mario Marin], in an effort that each testify falsely against Ayala." This argument fails. Ayala did not mention Marin before the state court, and Buchanan refused to testify. Thus, even if Chacon threatened Buchanan, Ayala cannot establish prejudice.

[22] This argument corresponds to claim 47.

holds that "[a] defendant has a constitutional due process right to remove for cause a juror who will automatically vote for the death penalty." *See United States v. Mitchell*, 502 F.3d 931, 954 (9th Cir. 2007) (citing *Morgan*, 504 U.S. at 719).

The California Supreme Court's rejection of this claim was not contrary to or an unreasonable application of *Morgan* because juror Cosgrove was not an automatic death penalty voter. Cosgrove told counsel during voire dire that he "would probably be 80 percent to 20 percent saying that if [he] felt that somebody did commit murder, that the death penalty should be applied," but he also said that "if there were mitigating circumstances, [he] would take them into effect and weigh them." Habeas relief is not warranted on this claim. *See Mitchell*, 502 F.3d at 955 (affirming on plain error review the district court's decision not to dismiss for cause a juror who "indicated that she thought the only punishment for certain kinds of 'horrific' crimes should be death" but later "qualified that response by indicating 'well, death or imprisonment'" and promised to keep an open mind); *United States v. Fulks*, 454 F.3d 410, 428 (4th Cir. 2006) (district court did not abuse its discretion by letting a juror serve despite his statement that he would vote for the death penalty in a murder case "say 90 percent of the time . . . unless [the mitigating circumstances are] something outrageous").[23]

---

[23] For the same reason, we affirm the district court's denial of relief on claim 34, in which Ayala argues that trial counsel was ineffective for failing to use a peremptory strike on juror Cosgrove. "Establishing *Strickland* prejudice in the context of juror selection requires a showing that, as a result of trial counsel's failure to exercise peremptory challenges, the jury panel contained at least one juror who was biased." *Davis v. Woodford*, 384 F.3d 628, 643 (9th Cir. 2004). Ayala has not established

## B. Exclusion of deceased witness's statements

Ayala argues that the trial court violated his constitutional right to present a defense when it excluded under California's hearsay rules the exculpatory statements of a deceased witness, Arthur Castro.[24]

During trial, Ayala moved to admit statements that Castro made to defense investigator Bill Papenhausen. The defense proffered Papenhausen to testify that Castro heard two people arguing in Spanish with Dominguez about a large sum of money on the day before the murders, and that Castro later saw "three males driving away in a large car with blue and white Mexican plates." The trial court denied Ayala's motion to admit Papenhausen's testimony under California's residual hearsay rule. *See Ayala*, 1 P.3d at 28–29. The California Supreme Court affirmed this ruling on direct review, *see id.* at 27–30, and the district court denied federal habeas relief.

*Chambers v. Mississippi*, 410 U.S. 284 (1973), is the applicable "clearly established Federal law." *See* 28 U.S.C. § 2254(d)(1). In *Chambers*, the Supreme Court held that a state court may not prohibit a defendant from presenting directly exculpatory evidence when the evidence is essential to the defendant's case and bears sufficient indicia of reliability. *See* 410 U.S. at 300–01. The facts in *Chambers* were extreme: After police officers arrested Leon Chambers for murder, his friend, Gable McDonald, confessed to three different people that he, not Chambers, committed the crime.

---

that juror Cosgrove was biased, so he cannot satisfy *Strickland*'s prejudice prong under AEDPA's deferential standard.

[24] This argument corresponds to claim 44.

*Id.* at 288–89. The trial court prohibited Chambers from presenting the testimony of these three witnesses under a Mississippi common-law evidentiary rule. *Id.* at 289. Without this evidence, the jury convicted Chambers of murder. *Id.* at 285. The Supreme Court reversed the conviction, holding "the exclusion of this critical evidence . . . denied [Chambers] a trial in accord with traditional and fundamental standards of due process." *Id.* at 302. The Court rejected Mississippi's argument that McDonald's prior confessions were hearsay and therefore unreliable because the confessions bore substantial indicia of reliability: they were against McDonald's penal interest, corroborated by other evidence, spontaneous, and McDonald was available for cross-examination. *Id.* at 300–01.

Fairminded jurists could disagree about whether the California Supreme Court's resolution of this claim was contrary to or an unreasonable application of *Chambers*. *See Bemore*, 788 F.3d at 1160 (discussing AEDPA's deferential standard). Evidence falls within *Chambers*'s admissibility rule only when its exclusion "significantly undermine[s] fundamental elements of the defendant's defense." *United States v. Scheffer*, 523 U.S. 303, 315 (1998). Here, while Castro's account of three Mexican men at the body shop supported defendant's theory of the case, it was not directly exculpatory like the confession in *Chambers*. *See* 410 U.S. at 297 (trial court's ruling effectively prevented Chambers "from exploring the circumstances of McDonald's three prior oral confessions"); *see also Scheffer*, 523 U.S. at 316 (observing that "*Chambers* specifically confined its holding to the 'facts and circumstances' presented in that case"). Also, Castro's statement had fewer indicia of reliability than the statement in *Chambers* because Castro told his story to a defense investigator who was assisting with trial preparation,

not "spontaneously to a close acquaintance." *Chambers*, 410 U.S. at 300. Although Castro did inculpate himself by admitting to heroin use, this statement was much less inculpatory than the one at issue in *Chambers*, where the declarant admitted to murder. *Id.* at 300–01. Finally, unlike the declarant in *Chambers*, Castro was not available for cross-examination. *Id.* at 301. The California court reached these same conclusions in its review of this claim. *Ayala*, 1 P.3d at 29–30. We cannot say that its decision was unreasonable, so Ayala is not entitled to habeas relief. *Andrews*, 798 F.3d at 773 ("When a state court may draw a principled distinction between the case before it and Supreme Court caselaw," federal habeas relief is not available).

## C. Prosecutorial misconduct during closing arguments

In his closing arguments, the prosecutor told the jury that several witnesses, including Meza, Castillo, Rafa, and Eduardo "Lalo" Sanchez,[25] made inconsistent statements because they were afraid of Ayala and "those people who associated with the defendant." *Ayala*, 1 P.3d at 40. Ayala argues that this and other similar statements in the prosecutor's closing argument violated his constitutional rights "because the prosecution improperly attempted to inject gang issues into the trial."[26] He separately argues that trial counsel was ineffective for failing to object to the

---

[25] Sanchez lived next door to the body shop and was one of the State's trial witnesses. To the apparent surprise of the prosecutor, Sanchez testified that he heard nothing on the night of the murders.

[26] This argument corresponds to claim 7.

allegedly improper statements.**27**   The California Supreme Court dismissed these arguments on direct review, *see Ayala*, 1 P.3d at 34–35, 40–41, and the district court denied federal habeas relief.

*Darden v. Wainwright*, 477 U.S. 168 (1986), is the relevant clearly established federal law.  In *Darden* the Court "explained that a prosecutor's improper comments will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Parker v. Matthews*, 132 S. Ct. 2148, 2153 (2012) (quoting *Darden*, 447 U.S. at 181).  *Darden* creates a "general" standard, giving state courts "more leeway" to apply it.  *Id.* at 2155 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

The California Supreme Court's rejection of Ayala's misconduct claim was not an unreasonable application of *Darden* because the prosecutor's statements that several witnesses feared Ayala were reasonably drawn from the witnesses' testimony.  *See Trillo v. Biter*, 769 F.3d 995, 1002 (9th Cir. 2014) (prosecutors are entitled to make reasonable inferences from the facts).  Castillo told the jury that he "had worries, concern for my family.  There was just three people shot, and I was shot and almost killed. . . .  There was some people out there that actually kill people."  Rafa told the jury that he originally testified for Ayala in part because "I was afraid that if I, you know, didn't want to cooperate with them . . . I might, you know, get killed or something."  Meza likewise explained that, although he helped plan the 43rd Street robbery, he did not participate because he feared the Ayalas would use the opportunity to kill him.

---

**27** This argument corresponds to claim 26.

Also, the prosecutor's closing argument adhered to the trial court's order concerning the admissibility of gang affiliation evidence. He did not mention gangs, the Mexican Mafia, or the EME, but instead argued that witnesses were afraid of "what the defendant stood for" and "those with whom the defendant associates." The jury could have understood these statements to mean that Ayala was a gang member, but it also could have understood them to mean that witnesses feared Ayala simply because he had been accused of triple murder. The prosecutor's comments about fear and association were not so prejudicial that they undermined the fundamental fairness of Ayala's trial. "Indeed, *Darden* itself held that a closing argument considerably more inflammatory than the one at issue here did not warrant habeas relief." *Parker*, 132 S. Ct. at 2155; *Darden*, 477 U.S. at 180 nn.9–11. Habeas relief is not warranted on this claim.

Nor was it unreasonable for the California Supreme Court to reject Ayala's related IAC claim. Counsel "was not constitutionally ineffective for failing to object to the prosecutorial statements . . . [because t]hose statements were based on reasonable inferences from the record." *See Trillo*, 769 F.3d at 1002; *see also Cunningham v. Wong*, 704 F.3d 1143, 1159 (9th Cir. 2013) ("[A]bsent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct." (quoting *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993))).

### D. Penalty-phase admission of the John Casas murder

In the penalty phase, the trial court permitted the State to submit evidence that, nearly ten years before trial, Ayala murdered an inmate named John Casas while the two were

incarcerated together.[28]  Ayala argues this was constitutional error because the state never charged him with this crime and "[t]he extensive pre-trial delay in prosecuting Ayala for the alleged Casas murder led to Ayala's demonstrable inability to present exculpatory evidence which would have and should have exonerated him had the allegations been timely brought."

Habeas relief is not warranted on this claim because Ayala has not shown he suffered prejudice from the government's delay in holding him accountable for the Casas murder.  *See United States v. Lovasco*, 431 U.S. 783, 784, 795–96 (1977) (a due process claim based on "a delay between the commission of an offense and the initiation of prosecution" requires defendant to establish prejudice and fault on the part of the government).  Ayala claims he suffered prejudice because he "lost" an exculpatory witness during the eight years that passed between the Casas murder and the penalty phase of his trial.  According to Ayala, this witness would have testified that he saw another inmate with a knife "about ten minutes before the [Casas] stabbing."  But this account is not suggestive of Ayala's innocence, particularly when set against the State's two witnesses, both of whom testified that they saw Ayala stab Casas.  Ayala's inability to show prejudice from this delay is fatal to his due process claim.  *Id.*

---

[28] This argument corresponds to claim 39.  Ayala presented this argument to the California Supreme Court on direct review, the California court rejected it, *Ayala*, 1 P.3d at 49, and the district court denied federal habeas relief.

## VII.    Cumulative error

Ayala next argues that the cumulative impact of his lawyers' deficiencies, the State's *Brady* violations, Detective Chacon's intimidation of witnesses, and the trial court's errors requires reversal of his conviction.[29]    We have previously recognized that "[a]lthough individual errors may not rise to the level of a constitutional violation, a collection of errors might violate a defendant's constitutional rights." *Woods*, 764 F.3d at 1139 (quoting *Davis*, 384 F.3d at 654). Here, we do not agree that Ayala has suffered such prejudice. Any errors made by trial counsel, the trial court, or the government in Ayala's case were minor and "did not render [Ayala's] trial fundamentally unfair." *See Davis*, 384 F.3d at 654.   Further, if Ayala suffered any injustice at trial, it was rectified by the district court's thorough handling of his federal habeas petition.    The district court's evidentiary hearing spanned twenty days and thoroughly aired Ayala's most meritorious claims (an opportunity most federal habeas petitioners are denied post-*Pinholster*).   During this hearing, the court took testimony from former witnesses, counsel, and investigators on Ayala's case and admitted dozens of exhibits.    The experienced district judge painstakingly reviewed Ayala's evidence, and was convinced that Ayala's conviction and sentence were not the product of an unfair trial.   We agree with Judge Moskowitz's conclusion.

---

[29] This argument corresponds to claim 2.

## VIII.   Actual innocence

Ayala's final claim is that he is actually innocent of these murders.[30]    The Supreme Court has assumed that a freestanding innocence claim is cognizable on federal habeas review, but it has noted that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Herrera v. Collins*, 506 U.S. 390, 417 (1993).  Ayala does not meet this high threshold of proof.  Neither the evidence before the state court nor the evidence adduced at the 2010 evidentiary hearing supports Ayala's contention that key witnesses against him lied at the behest of the government.  Nor does the record support Ayala's claim that the prosecution withheld essential evidence about Meza's immunity agreement or relationship with Detective Chacon.  The evidence Ayala introduced in 2010 to support his habeas petition is much less compelling than that submitted by the petitioner in *Herrera*.  *See id.* at 396–98 (denying Herrera's actual innocence claim even though several individuals, including one eyewitness, submitted affidavits claiming that Herrera's brother committed the murders for which Herrera had been convicted).   The Supreme Court's denial of Herrera's freestanding innocence claim urges the same result here, and the California court's dismissal of this claim was therefore not unreasonable.  *See* 28 U.S.C. § 2254(d)(1).

---

[30] This argument corresponds to claim 1.  Ayala presented this claim in his Exhaustion Petition, the California Supreme Court summarily denied it, and the district court denied relief.

## CONCLUSION

For the foregoing reasons, we affirm the district court's denial of Ayala's petition for writ of habeas corpus.

**AFFIRMED**.